**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 16-13-DLB-CJS**

**DAVID SMITH**                                                                                   **PLAINTIFF**


**v.**                                   **MEMORANDUM OPINION AND ORDER**


**CAMPBELL COUNTY, KENTUCKY, et al.**                               **DEFENDANTS**

\* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*

On February 2, 2015, David Smith was arrested for drug crimes in Campbell County, Kentucky, and transported to the Campbell County Detention Center ("CCDC"). During his time at the CCDC, Plaintiff suffered from epidural abscesses and osteomyelitis of the spine, resulting in sepsis and acute paraplegia of the lower part of his body. Plaintiff filed suit against Campbell County, Campbell County Jailer James Daley, Southern Health Partners, Inc. ("SHP"), Dr. Mina Kalfas, nurses Anna Nash, Marissa Sparks, Amanda Clarkson, Leslie Doremus, and Krista Slayback, and various John and Jane Does. In his Complaint, Plaintiff alleges that Defendants exhibited deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the federal Constitution. (Doc. # 1 at 8-9). He also brings numerous pendant state-law claims, including negligence, outrage, intentional infliction of emotional distress, and violation of Kentucky Administrative Regulation ("KAR") 501 3:090. *Id.* at 9-10.

There are currently two Motions for Summary Judgment before the Court, both of which are fully briefed and ripe for review. (Docs. # 89, 91, 98, 99, 100, and 101).

Defendants Campbell County and James Daley (collectively "County Defendants") seek summary judgment on the deliberate-indifference and state-law claims against them. (Doc. # 91). They also argue that the claims against the John Doe defendants should be dismissed. *Id.* SHP, Kalfas, Nash, Sparks, Clarkson, Doremus, and Slayback (collectively "SHP Defendants") also filed a Motion for Summary Judgment, requesting dismissal of all claims against them. (Doc. # 89). For the reasons set forth below, the County Defendants' Motion for Summary Judgment is **granted**. The SHP Defendants' Motion for Summary Judgment is **granted in part and denied in part**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff David Smith was arrested February 2, 2015 on a warrant in Campbell County, Kentucky, for several drug-related crimes. (Doc. # 89-1). Smith was taken to the Campbell County Detention Center ("CCDC") where he remained incarcerated until March 5, 2015. At the time of his incarceration, Campbell County contracted with Southern Health Partners, Inc. ("SHP") to provide medical care to inmates at CCDC. (Doc. # 89-2). In turn, SHP contracted with Dr. Mina Kalfas to oversee the administration of medical care at CCDC. (Doc. # 89-3).

Upon admission to the CCDC on February 2nd, Smith advised prison staff of a number of health problems, including withdrawal from heroin, depression, anxiety, leg pain, and a history of pain and bone fractures in his back. (Doc. # 98-3). Later on the same day, Smith reported to SHP nurse Marissa Sparks—a named defendant in this case—that he suffered from high blood pressure, depression, bipolar disorder, and hepatitis B and C and that he was taking blood pressure medications. (Docs. # 98-4 and 89-5). Smith also told the SHP nursing staff that he had overdosed on heroin in January

2014 and had attempted suicide "over a year ago." (Doc. # 89-5). That same day, the SHP physician on staff at the CCDC, Dr. Mina Kalfas (also a named defendant), gave orders for detox and blood pressure monitoring. (Doc. # 89-6). Smith's medication reconciliation from CVS Pharmacy showed that his current medications were Lisinopril, HCTZ, Zantac, Cymbalta, Elavil, and Lithium, which all had been filled on January 2, 2015. (Doc. # 89-7). On February 3, 2015, Smith refused to allow SHP head nurse[1] Krista Slayback (a named defendant) to evaluate him for his antidepressant medications, Elavil and Cymbalta. *Id.* Smith also declined further detox monitoring on February 4th. *Id.*

On February 5, 2015, Smith requested medical assistance by submitting a "Sick Call Slip," complaining of "Chronic Pain Due to Back" and indicated that it had been going on for the past two weeks. (Doc. # 98-5). SHP nurse Amanda Clarkson (who is also a named defendant) responded to the Sick Call Slip on February 7th and recorded the results on a "Clinical Pathways/Patient Clinical Data Form." (Doc. # 89-11). Smith described his pain as "aches" and stated that his pain level was 8 out of 10 on the pain scale. *Id.* He also reported that his pain was greater with activity. *Id.* When asked if he had had this pain before, his answer was "no." *Id.* Despite Smith being "very verbal" about his pain and his statement that his pain level was 8 out of 10 on the pain scale, Nurse Clarkson perceived Smith to be in only "slight pain" because he did not manifest physical symptoms of extreme pain, including sweating or difficulty breathing. (Doc. # 98-6 at 59). Nevertheless, Nurse Clarkson observed that Smith's vital signs were "slightly elevated," so she recommended a three-day regimen of ibuprofen 400 mg, which Dr.

---

[1]     Nurse Slayback's formal title at the CCDC was "Medical Team Administrator." (Doc. # 49-7 at 170).

Kalfas prescribed.  (Docs. # 89-6 and 98-6).

Smith filled out his second Sick Call Slip on February 8, 2015, writing "Back Pain Severe."  (Doc. # 98-7).  Nurse Julia Schlake (not a named defendant) responded to Smith's Sick Call Slip on February 9, 2015.  (Doc. # 98-8).  Again, Smith complained of constant pain that was 8 out of 10 on the pain scale and that had started two weeks ago. *Id.*  Smith also stated that the increased pain began when he "sneezed and felt like he [had] pulled a muscle."  (Doc. # 89-13).  Nurse Schlake determined that Smith's vital signs were "elevated," but did not prescribe any additional treatment, as Smith was still taking ibuprofen.  (Doc. # 98-9 at 47).  Later on February 9th, Smith was seen by SHP Nurse David Watkins (not a named defendant), although no written record of this visit exists. (Doc. # 98-10 at 46).

On February 10th, Nurse Leslie Doremus (also a named Defendant) attempted to conduct a "History and Physical Assessment" for Smith, but he declined, stating "Don't need one."  (Doc. # 89-14).  On February 11th, Smith submitted a third Sick Call Slip, on which he wrote "Upper back Disc . . . as well as breathing due to Spinal Compression!! Please Help!!"  (Doc. # 98-11).  He also wrote that had experienced the problem for "years but last two weeks."  *Id.*  Nurse Schlake responded on February 12th and noted that Smith was experiencing pain in the middle of his back that was a 10 on the pain scale.  (Doc. # 98-12).  Smith once again told the nurse that the onset of back pain corresponded with a sneeze two weeks prior to entering CCDC.  *Id.*  Nurse Schlake recommended Tylenol, which Dr. Kalfas prescribed that same day.  (Docs. # 89-6 and 98-12).

Smith filed his fourth Sick Call Slip on February 13, 2015, which stated "Need to See Doctor ASAP Back."  (Doc. # 98-13).  Smith was seen by Nurse Clarkson on February

14th.   (Doc. # 98-14).  In her evaluation, Nurse Clarkson noted that Smith described his back pain as "sharp, aches," and that his pain was at a 10 on the pain scale.  *Id.*  She also noted "prior back injury" and that his vital signs were normal.  *Id.*  Nurse Clarkson did not recommend new treatment.  *Id.*

On February 15, 2015, Smith sent in his fifth Sick Call Slip, complaining of "Back Pain Numbness and Tingling Extra Strength Tylenol and See The Doctor!!"  (Doc. # 98-15).  Smith was seen by Nurse Doremus on February 16th.  (Doc. # 89-20).  During this visit, Smith stated that his back pain started in 2007 when he was "hit by a tractor" in an accident.  *Id.*  Smith further reported that his pain was constant and a 5 out of 10 on the pain scale.  *Id.*  Despite mentioning numbness and tingling in his Sick Call Slip, the Clinical Pathways form that Nurse Doremus filled out did not mention numbness or tingling.  Smith was prescribed Naproxen 500 mg for his pain.  (Docs. # 89-6 and 89-20).

Dr. Kalfas examined Smith for the first time on February 17, 2015.  During the examination, Smith complained of "back pain, neck mid back pain."  (Doc. # 98-17).  Dr. Kalfas recorded that Smith had seen a chiropractor at age fifteen and was hit by a forklift in 2007, resulting in a "crushed" L5-S1 in his back.  *Id.*  Dr. Kalfas noted that Smith received treatment for his back from Dr. Hanson, who performed "epidurals and dye."  *Id.*  In addition, Smith reported problems with his left ankle, knee, and with heartburn.  *Id.*  Dr. Kalfas also observed that Smith had been on heroin, that he had not had any recent Lithium labs, and that he had no upper extremity or lower extremity symptoms at the time.  (Docs. # 98-17 and 49-7 at 107).  Based on his examination and review of Smith's health history, Dr. Kalfas diagnosed Smith with degenerative disc disease that caused chronic back and neck pain.  (Doc. # 49-7 at 107).  As treatment, he prescribed Voltaren (an anti-

inflammatory gel) and Baclofen (a muscle relaxant).  (Doc. # 98-17).  Dr. Kalfas also prescribed Prilosec for Smith's heartburn and ordered labs for Lithium.  (Docs. # 89-6, 98-17, and 49-7 at 107).

On February 22, 2015, Smith complained of pain in his lower back, along with tingling and numbness in his lower extremities.  (Doc. # 98-22).  He also indicated that the pain interfered with walking.  (Doc. # 98-22).  Nurse Doremus completed an examination, during which she noted Smith had facial grimacing.  (Doc. # 98-22).  Nurse Doremus did not record Smith's pain level, nor did she complete a Clinical Pathways form. (Doc. # 98-16 at 44, 47).  She reported Smith's symptoms to Dr. Kalfas, who prescribed a higher dose of Baclofen.  (Docs. # 89-6 and 98-19).

In the early morning of February 25, 2015, Smith approached Deputy Rickey Pemberton, who noticed that Smith was "breathing heavy and was in pain."  (Doc. # 98-20 at 2).  Smith told Deputy Pemberton that if he wasn't sent to the hospital to treat his pain, he would swallow a razor blade.  *Id.*  Noticing what appeared to be metal in his mouth, Deputy Pemberton contacted SHP Nurse Marissa Sparks, who was unable to contact her supervisor.  (Doc. # 98-21 at 4-5).  After some time, Smith revealed that the "razor blade" was in fact a metal washer and that he was just trying to get some help because he was in so much pain.  *Id.* at 3.  Later on February 25th, Smith was evaluated by a social worker at NorthKey mental health clinic, who noted that Smith reported back pain and had threatened to swallow a razor blade if not treated.  (Doc. # 98-23).  The social worker also noted that Smith apologized and stated that he wanted treatment for his pain.  *Id.*  Smith reported to the social worker that he had attempted suicide in 2002 and 2011.  *Id.*  As a result of this incident, Smith was assessed as a high risk for suicide,

placed in an anti-suicide smock, and relocated to an observation cell. (Doc. # 98-22). Smith was taken off suicide watch that same afternoon. *Id.*

On February 26, 2015, Smith submitted his sixth Sick Call Slip, complaining of "Back Pain, Possible Bulging Discs Need to See Doctor Need X Rays Immediately." (Doc. # 98-24). He wrote on the Sick Call Slip that he had had the problem for 25 days. *Id.* Smith was tended to by Nurse Doremus, who took Smith's vitals and referred him to Dr. Kalfas. (Doc. # 98-22). There is no indication in the record that Doremus completed a Clinical Pathways form for this visit.

Later that day, Smith was examined by Dr. Kalfas for the second time. *Id.* Smith complained to Dr. Kalfas of increased pain in his back and right buttock. *Id.* Dr. Kalfas acknowledged that he would have reviewed the progress note from February 22nd, which indicated that Smith had complained of numbness and tingling in his legs as well as difficulty walking. (Doc. # 49-7 at 92). Smith also claims to have told Dr. Kalfas during this visit that he was experiencing "sporadic paralysis." (Doc. # 98-45 at 5). In his evaluation, Dr. Kalfas noted that Smith had sustained injuries in multiple motor vehicle accidents, including a forklift injury in 2007. (Doc. # 98-22). Dr. Kalfas performed a straight-leg-raise test, which revealed radiating pain. *Id.* Smith also reported pain when bending axially and cried out when Dr. Kalfas put pressure on several para-spinal areas. *Id.* Despite this, Dr. Kalfas diagnosed Smith with malingering, observing that Smith exaggerated his pain and his gait. (Docs. # 49-7 at 96 and 98-22). In addition to his exaggerated gait, Dr. Kalfas recorded that Smith "cried out excessively," (Doc. # 98-22), in one instance shouting "oh, oh" as Dr. Kalfas pressed lightly on his head. (Doc. # 49-7 at 98). Dr. Kalfas also stated in his deposition that he suspected Smith to be malingering

"[b]ecause he wanted to go to the hospital." *Id.* at 93.  In response to Smith's complaint

of sporadic paralysis in his legs, Dr. Kalfas advised that he could still walk because he

was capable of moving his toes.  (Doc. # 98-45 at 5).  Also during this evaluation, Smith

requested an X-ray, which Dr. Kalfas declined, citing "no recent trauma."  (Docs. # 49-7

at 99 and 98-22).  Dr. Kalfas also noted that Smith had no swelling or inflammation and

no motor or sensory deficits.  (Doc. # 98-22).  Notably, Dr. Kalfas did not order any

treatment as a result of this second examination.  (Doc. # 49-7 at 100).

On February 27, 2015, Officer Alexander Fead wrote in an incident report that he

had heard Smith moaning while "slowly attempting to sit in a chair." (Doc. # 98-26).  Smith

told Officer Fead that he was experiencing back pain.  *Id.*  Officer Fead notified Nurse

Schlake, who said that she "would contact the doctor to see if anything could be done.

*Id.*  Also on February 27th, Smith submitted a Campbell County Inmate Grievance Form,

on which he wrote

> Issues I have is medical refuses to find solution by looking into cause by x
> -Ray. They think trying to mask the pain external with medication. But
> without knowing cause. How can you treat the problem and letting problem
> get works and cause more damage. Back problems can lead to paralysys
> or death!!I cause issues within the dorm by excess painful out crys through
> out the night!! If you heard any details ask any night officers who have seen
> me in degress of health!!Please I just want to find out problem before any
> more damage encures. P.S. medical staff as well as Dr. Calvis. I believe
> E.R. would be only option! Thank you.

(Doc. # 98-27).

On March 1, 2015, Smith sent in his seventh Sick Call Slip, stating "No

Improvement In Back!!  Getting Worse and Causing Breathing Problems and Sore Ribs!!

Also Need Treatments for Heels Cracked Bad!!"  (Doc. # 98-28).  While on an observation

round at 7:30 a.m. on March 2nd, Officer Tyler Holzschuh heard Smith making "audible

'grunting' sounds as if he was in pain."  (Doc. # 98-31).   Officer Holzschuh wrote in his report that "Smith was observed laying in his bunk, out of breath and stated 'my legs are numb, I can't feel my legs all the way up to my waist.'"  *Id.*  After reporting the incident to his supervisor, Officer Holzschuh called Nurse Slayback, who advised Officer Holzschuh that Smith was "faking" and that he was already on the sick call list for later that morning.  *Id.*  According to Officer Holzschuh, Nurse Slayback told him that Smith "had ready seen the doctor twice in the past month for the same issue."  *Id.*  Nurse Slayback also stated that "for the numerous times he has been evaluated for the same issue by the medical department, Inmate D. Smith needed to be placed into medical isolation for observation."  *Id.*  Officer Holzschuh testified that at the time of his report, Smith was being housed in "DS-3 203 A," an isolation cell used for inmates who have medical issues or disciplinary problems.  (Doc. # 98-32 at 6).  Holzschuh indicated that Smith had been moved into isolation because he was disturbing other inmates by crying out in pain during the night.  *Id.* at 7.

Smith was seen by Nurse Slayback twice on March 2nd.  At 11:20 a.m., Nurse Slayback noted that Smith complained of back pain and numbness in both legs.  (Doc. # 98-29).   She observed that Smith was not answering her questions and continually moaned.  *Id.*  Nurse Slayback ordered that Smith be held in isolation for "abuse of medical services."  *Id.*  Later at 1:56 p.m., Nurse Slayback observed that Smith was able to bear weight and move all of his extremities.  *Id.*  He continued to moan, yell, and scream.  *Id.*  Nurse Slayback recommended that Smith get an X-ray, which Dr. Kalfas approved.  (Doc. # 49-5 at 48-49).  Smith received an X-ray on March 2, 2015, which showed degenerative disc disease in the thoracic and lumbar spine.  (Doc. # 89-26).

On March 3, 2015, Officer Patricia Dietz was notified that Smith had urinated on himself. Smith told her that he was unable to walk and could not move to get water or to use the restroom. (Doc. # 98-33). Officer Dietz spoke with Nurse Schlake, who said that Smith had received X-rays, which showed no broken bones. (Doc. # 98-33). Smith was given a jug of water and his pants were taken to be washed. (Doc. # 98-33). Also on March 3rd, Smith was seen by Dr. Kalfas for the third time, who reviewed the X-ray results and noted that Smith complained of increased pain. (Doc. # 98-29). Dr. Kalfas acknowledged that he would have seen the progress notes from the day before stating that Smith complained of bilateral leg numbness and was seen moaning, yelling, and screaming. (Doc. # 49-7 at 58). He also states in his notes that Smith had back issues and testified that Smith "appeared to be in some pain." *Id.* at 69. Nevertheless, Dr. Kalfas concluded once again that Smith was malingering. (Doc. # 98-29). According to Dr. Kalfas's notes, a sensory examination of Smith's lower extremities was "inconsistent." *Id.* He wrote that Smith would withdraw his feet in response to stimuli but act as if he didn't feel anything. *Id.* Dr. Kalfas also observed that Smith's deep tendon reflexes were 2+ and symmetrical, the pulses were intact, and he had good strength and coordination of his lower extremities. *Id.* Finally, when Smith told Dr. Kalfas that he was unable to walk, Dr. Kalfas told Smith that he "need[ed] to get up and walk!" and explained in his deposition that this command "ha[d] a little bit of forcefulness behind it." (Doc. # 49-7 at 63). Dr. Kalfas testified that after he ordered Smith to walk, Smith "got up slowly and he limped a little bit and seemed to, after a couple steps, move a little better." (Doc. # 49-7 at 69). Dr. Kalfas ordered no new treatment or diagnostic tests as a result of this third exam.

At 6:37 p.m. on March 3rd, Officer Dietz received a phone call from Smith's sister, Casey Simon, who requested that her brother be taken to the hospital because he could not feel his legs. (Doc. # 98-35). Smith's sister called again on March 4th at 1:57 p.m., this time speaking with Nurse Slayback. (Doc. # 98-37). Smith's sister told Nurse Slayback that Smith was not mentally stable and that she was concerned for his safety. *Id.* She also told Nurse Slayback that Smith was unable to move his legs and that he needed to be transferred to the emergency room. *Id.* Nurse Slayback told Smith's sister that Smith had been evaluated by the prison doctor and that "if any issues arise [Smith] will be treated." *Id.* Later on March 4th, Smith was again placed on suicide watch after Nurse Slayback observed multiple scratch marks on Smith's left forearm. (Doc. # 98-37). According to Nurse Slayback's Progress Notes, Smith denied any suicidal ideations and claimed the scratches resulted from the wall. *Id.* While on suicide watch, Smith was observed yelling. (Docs. # 98-10 at 3 and 98-38).

On March 5, 2015 at 5:00 a.m., Smith was observed laying on the floor of his cell yelling for help. (Doc. # 98-40). Sergeant Pemberton and three deputies responded to Smith's cell. *Id.* Smith told the officers that that he had fallen from his bunk and couldn't get up, but that he did not want assistance in returning to his bunk for fear of "hurting his back worse." *Id.* Smith further stated that he did not want anyone but a "St. Elizabeth [Hospital] medical professional" to help him. *Id.* Sergeant Pemberton told Smith that "you have been checked by our medical staff, had xrays, and they the medical staff say that you can walk." *Id.* Later at 8:30 a.m., Nurse Slayback observed Smith sleeping on his stomach on the floor. (Doc. # 98-37). Nurse Slayback examined Smith when we woke up less than two hours later. *Id.* Nurse Slayback noted that she witnessed Smith move

his legs and wiggle his toes despite his claims to the contrary. (Doc. # 49-5 at 32). Nevertheless, Nurse Slayback decided to transport Smith to St. Elizabeth Hospital for evaluation of Smith's mental status and because of "psychosomatic complaints of lower extremity paralysis." (Docs. # 49-7 at 45 and 98-37). She testified that Smith was able to bend his knees in the process of moving him into the wheelchair and did not appear to be in pain. (Doc. # 49-5 at 33). She also observed that he was able to stand and walk with the assistance of one person on each side. *Id.* at 34. Numerous officers who transported Smith to the hospital corroborated Nurse Slayback's account. For instance, Officer Joan Warfield noted that "[a]s deputies and medical personnel were helping [Smith] to the wheel chair he was moving his legs and at the same time stating he could not move them." (Doc. # 98-41).

Upon admission to St. Elizabeth Hospital in Edgewood, Kentucky, Dr. Laroy Kendall noted that Smith complained of back pain, difficulty walking, and abdominal pain. (Doc. # 98-43). Dr. Kendall also observed that Smith "reports that he cannot move his lower extremities but has been witnessed to move them on several occasions and did move them for me." *Id.* Doctors at St. Elizabeth later determined that Smith had a spinal abscess and osteomyelitis of the spine. (Doc. # 98-39). Doctors performed an emergency L7-10 laminectomy on the afternoon of March 5, 2015. *Id.* Also on March 5th, Nurse Schlake wrote that Deputy O'Brien had received reports from inmates that Smith was giving away his commissary and food trays in exchange for getting assaulted so that he could go to the hospital. *Id.* Smith was discharged on April 30, 2015, at which point he was determined to be paraplegic with "trace" movements of his legs. (Doc. # 89-1 at 8). Smith was then transported to Gateway Rehabilitation Hospital. *Id.* Upon

discharge from Gateway on May 27, 2015, Smith was diagnosed with the "effects of spinal epidural abscess with MRSA with paraplegia." *Id.* At the time of discharge from Gateway, Smith was unable to move or ambulate. *Id.*

On January 29, 2016, Smith sued Campbell County, Jailer James Daley, SHP, Dr. Kalfas, and nurses Anna Nash, Marissa Sparks, Amanda Clarkson, Leslie Doremus, and Krista Slayback, and ten John and Jane Does. (Doc. # 1). Plaintiff alleged that defendants exhibited deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. (Doc. # 1 at 8-9). Plaintiff also brought pendant state claims, including negligence, outrage, intentional infliction of emotional distress, and violation of Kentucky Administrative Regulation ("KAR") 501 3:090. (Doc. # 1 at 9-10). On April 30, 2018, both the SHP and County Defendants filed Motions for Summary Judgment on all claims. (Docs. # 89 and 91). Plaintiff filed Responses (Docs. # 98 and 99), to which both sets of Defendants replied. (Docs. # 100 and 101).

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once a party files a properly-supported motion

for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Id.* at 252.

The Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in his favor." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255). The Court may not "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial." *Id.* (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52). If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded. *Anderson*, 477 U.S. at 248.

As the moving parties, the Defendants must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of each of Plaintiff's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming Defendants satisfy their burden, the Plaintiff "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). Furthermore, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

### B. Pseudonymous Defendants

As an preliminary matter, the Defendants identified in Plaintiff's Complaint as "John and Jane Does 1-10" must be dismissed under Federal Rule of Civil Procedure 4(m), which states that "[i]f service . . . is not made upon a defendant within 120 days after the filing of the complaint, the court . . . shall dismiss the action without prejudice as to that defendant . . . ."  As Plaintiff provides no evidence that these pseudonymous defendants have been served, all claims against those defendants must be dismissed without prejudice.[2]  Fed. R. Civ. P 4(m); *see Petty v. Cty. of Franklin*, 478 F.3d 341, 345 (6th Cir. 2007).

### C. Defendants Anna Nash and Marissa Sparks

In his Response to the SHP Defendants' Motion for Summary Judgment, Plaintiff concedes that the facts do not support any of his claims against Defendant nurses Anna Nash and Marissa Sparks.  (Doc. # 98 at 22).  After reviewing the record, the Court agrees.  Accordingly, all of Plaintiff's claims against Anna Nash and Marissa Sparks are **dismissed with prejudice**.

### D. Section 1983 Deliberate Indifference Claim

Both the County and SHP Defendants seek summary judgment on Plaintiff's § 1983 claim.  To prevail on a claim under 42 U.S.C. § 1983, a plaintiff "must establish that he was [1] denied a constitutional right, and [2] that the deprivation was caused by a

---

[2]     As the court in *Petty v. County of Franklin* pointed out, dismissal without prejudice in this circumstance is "of little practical relevance," given the fact that if Smith were to refile today, his claim would be barred by the 1-year statute of limitations for personal injury claims in Kentucky.  *See Petty*, 478 F.3d at 346 n.3; *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990) (noting that statute of limitations for § 1983 claims in Kentucky is one year).

defendant acting under color of state law." *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014). The Court will address the second element first.

### 1. Under color of state law

With the exception of Dr. Kalfas, none of the Defendants dispute that the second element is met in this case. Counties are suable "persons" under § 1983. *Alkire v. Irving*, 330 F.3d 802, 814 (6th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)); *see also Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010). Furthermore, county correctional institutions and their employees are routinely regarded as acting under color of state law. *See, e.g.*, *Blosser v. Gilbert*, 422 F. App'x 453, 456 (6th Cir. 2011); *Jones*, 625 F.3d at 944-46. Therefore, Campbell County and Campbell County Jailer James Daley may both be sued under § 1983.

Likewise, SHP and its employees, including the nurse defendants in this case, are subject to suit under § 1983 because they acted under color of state law. "It is well settled that private parties that perform fundamentally public functions, or who jointly participate with a state to engage in concerted activity, are regarded as acting 'under color of state law' for the purposes of § 1983." *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). "Contracting out prison medical care does not relieve" the Commonwealth or its counties of the "constitutional duty to provide adequate medical treatment to those in its custody, and does not deprive . . . prisoners of the means to vindicate their" constitutional rights. *West v. Atkins*, 487 U.S. 42, 56 (1988); *see also Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993). Thus, SHP and its employees are suable persons under § 1983.

Meanwhile, Dr. Kalfas contends—without citation to case law—that he did not act under color of state law because he is an independent contractor of SHP and not a direct

employee.  (Doc. # 89-1 at 14-15).  In essence, Dr. Kalfas argues that while a private contractor of a county jail is suable under § 1983, a private *sub*contractor is not.  Plaintiff argues to the contrary, citing *Carl v. Muskegon County*, 763 F.3d 592 (6th Cir. 2014) for the proposition that "the employment arrangement of an individual does not affect the authority under which they act."  (Doc. # 98-19).  The Court agrees with Plaintiff on this point.

In *Carl*, a county jail contracted out psychiatric services to another county agency, which then hired a private physician as an independent contractor.  763 F.3d at 594.  The court found that the physician could be sued under § 1983 because she was acting under color of state law.  *Id.* at 595.  *Carl* held that in determining whether a private prison doctor is a state actor for purposes of § 1983, the key question is if the doctor "exercise[s] powers which are traditionally exclusively reserved to the state."  *Id.* (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).  The court had no trouble in concluding that providing medical care to individuals in state custody constitutes a traditional state function.  *Id.* at 596.  Hence, the *Carl* physician's psychiatric evaluation of the incarcerated plaintiff was sufficient to qualify her as a state actor.  *Id.*  Likewise in this case, Dr. Kalfas was performing a traditional state function by treating individuals, including Plaintiff, who were detained in the CCDC.  Therefore, Dr. Kalfas will be considered a state actor.

Dr. Kalfas counters that *Carl* is distinguishable because the psychiatrist in that case contracted directly with a county agency.  (Doc. # 100 at 3).  Yet, *Carl* makes clear that "an employment relationship does not control whether a private individual acts under color of state law."  763 F.3d at 597 (citing *West*, 487 U.S. at 56).  Rather, "[i]t is the physician's function . . . that determines whether he is acting under color of state law."

*Id.* (alteration in original) (quoting *West*, 487 U.S. at 56).

Accordingly, just last year, the Sixth Circuit found that a private subcontractor who provided healthcare in a county prison could be subject to liability under § 1983. In *Winkler v. Madison County*, 893 F.3d 877, 885 (6th Cir. 2018), the court adjudicated a § 1983 deliberative-indifference claim involving a county that had contracted with a private medical provider, Advanced Correctional Healthcare, Inc., which "in turn entered into a contract with Dr. Nadir H. Al-Shami to be the staff physician at several county jail facilities." Although the court ultimately affirmed a grant of summary judgment for all defendants, including Dr. Al-Shami, it easily concluded that Dr. Al-Shami acted under color of state law, observing that "[t]he principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Id.* at 890.[3] Thus, the Court has little difficulty in finding Dr. Kalfas to have acted under color of state law.

### 2.    *Deprivation of a constitutional right*

Having concluded that all the Defendants in this case acted under color of state law, the Court next turns to the first element of a § 1983 claim —"whether there was an actionable deprivation of a right secured under the Constitution or the laws of the United States." *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005).

---

[3]      Federal district courts in Kentucky have consistently found private subcontractors to be state actors for purposes of § 1983. *See, e.g.*, *Hamilton v. Pike Cty.*, 2013 WL 529936, at *2 (E.D. Ky. Feb. 11, 2013) (including within § 1983's reach an "independent contractor Southern Health [Partners] hired to provide medical services at the Pike County Jail"); *Finn v. Warren Cty.*, 2012 WL 3066586, at *14 (W.D. Ky. July 27, 2012), *reversed in part on other grounds*, 768 F.3d 441 (6th Cir. 2014) (rejecting the argument made by the Medical director at a County facility "that he is not a state actor for purposes of § 1983 because he is an independent contractor hired by an independent contractor, and is thus twice removed from the State").

Prisoners in state custody have a right to adequate medical care under the Eighth Amendment. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Pretrial detainees like Smith have the same right by way of the Due Process Clause of the Fourteenth Amendment. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). The Sixth Circuit "has historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Id.* (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).

To establish a cause of action under § 1983 for failure to provide adequate medical treatment, a pretrial detainee must show that "the defendants acted with 'deliberate indifference to [his] serious medical needs.'" *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate-indifference claim involves an objective and subjective component. *Richmond*, 885 F.3d at 937-38. "The objective component requires the plaintiff to show that the medical need at issue is 'sufficiently serious.'" *Id.* at 938 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison*, 539 F.3d at 518 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004)).

None of the Defendants in this case dispute that the objective component has been satisfied. Nor could they, as Plaintiff was diagnosed with an epidural abscess and osteomyelitis of the spine resulting in sepsis and paraplegia. (Docs. # 89-1 at 8 and 98-39); *see Taylor v. Franklin Cty.*, 104 F. App'x 531, 538 (6th Cir. 2004) (finding that a plaintiff whose undiagnosed spinal tumor resulted in paralysis had met the objective prong

of the deliberate-indifference test); *Ham v. Marshall Cty.*, No. 5:11-cv-11, 2012 WL 6675133, at *6 (W.D. Ky. Dec. 21, 2012) (holding that a jury could find the objective component satisfied for a plaintiff who suffered from a spinal abscess which "ultimately required emergency surgery and left him paraplegic").

The contested issue in this case is the subjective component of the deliberate-indifference standard. For the subjective component, "the detainee must demonstrate that the defendant possessed 'a sufficiently culpable state of mind in denying medical care.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (quoting *Blackmore*, 390 F.3d at 895). While mere negligence is insufficient to establish deliberate indifference, a plaintiff does not have to demonstrate that the defendant acted with purpose or knowledge. *Jones*, 625 F.3d at 941. "Instead, the prison official must have acted with a state of mind similar to recklessness." *Id.* (citing *Farmer*, 511 U.S. at 836).

Thus, to prove the required level of culpability, "the plaintiff must allege facts which, if true, would show that the official being sued [1] subjectively perceived facts from which to infer substantial risk to the prisoner, [2] that he did in fact draw the inference, and [3] that he then disregarded that risk." *Darrah v. Krisher*, 865 F.3d 361, 368 (6th Cir. 2017) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). As many courts have observed, prison officials "do not readily admit this subjective component." *Phillips v. Roane Cty.*, 534 F.3d 531, 540 (6th Cir. 2008); *see also Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). Consequently, it is "permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Phillips*, 534 F.3d at 540 (internal quotation marks omitted). A "court must also consider other factors—such as the obviousness of the risk, the information available to the official,

the observable symptoms, and the expected level of knowledge of the particular official." *Sours v. Big Sandy Reg'l Jail Auth.*, 593 F. App'x 478, 484 (6th Cir. 2014).

Consequently, liability can be established "simply by showing that the correctional officer 'refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Richko v. Wayne Cty.*, 819 F.3d 907, 918 (6th Cir. 2016) (quoting *Farmer*, 511 U.S. at 843 n.8). For summary-judgment purposes, it is sufficient that "defendants *could* have perceived a substantial risk of serious harm to [plaintiff]. Whether in fact they perceived, inferred or disregarded that risk is an issue for trial." *Clark-Murphy v. Foreback*, 439 F.3d 280, 290 (6th Cir. 2006) (emphasis added).

"[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 105. Accordingly, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid [constitutional] claim of medical mistreatment." *Id.* at 106. Similarly, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703.

Yet, "[i]n cases involving mistreatment by medical personnel, [the Sixth Circuit] has held that 'less flagrant conduct [than that of other government officials] may constitute deliberate indifference.'" *Phillips*, 534 F.3d at 544 (second alteration in original) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)). While medical malpractice does not amount to a constitutional violation, a doctor "has a duty to

do more than simply provide some treatment to a prisoner who has serious medical needs; instead, the doctor must provide medical treatment to the patient without consciously exposing the patient to an excessive risk of serious harm." *Phillips*, 534 F.3d at 544 (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)). In determining whether a prison doctor's conduct rose to the level of deliberate indifference, the question to ask is "whether a reasonable doctor in his position could have concluded that a substantial risk of serious harm to [plaintiff] existed." *Id.*; *see also Terrance*, 286 F.3d at 845.

When deciding deliberate-indifference claims against multiple defendants, "the court should consider whether each individual defendant had a sufficiently culpable state of mind." *Phillips*, 534 F.3d at 542. Therefore, the Court will analyze each defendant separately, grouping them together only when appropriate based on the facts. *Id.*

### a. Dr. Kalfas

Dr. Kalfas first became involved in Plaintiff's medical care on February 7th, when he prescribed Plaintiff pain medication. However, he did not physically examine Smith until February 17th, when he ordered a Lithium lab and diagnosed Smith with degenerative disc disease. Dr. Kalfas visited with Smith again on February 26th and March 3rd and performed physical examinations, but did not order any additional treatment or other diagnostic tests as a result. He did, however, approve an X-ray for Smith upon Nurse Slayback's request on March 2nd.

Dr. Kalfas moves for summary judgment on Smith's § 1983 claim on the basis that he was not deliberately indifferent to Smith's serious medical needs. As set forth above, Plaintiff must demonstrate a genuine dispute of material fact regarding whether Dr. Kalfas

(1) subjectively perceived facts from which to infer substantial risk to Smith, (2) did in fact draw the inference, and (3) then disregarded that risk. *Darrah*, 865 F.3d at 368. Plaintiff argues that the seriousness of his condition was self-evident, and yet Dr. Kalfas administered little or no treatment and thus ignored an excessive risk of harm. (Doc. # 98 at 17-18).

In response, Dr. Kalfas argues that there is no evidence showing that he "consciously disregarded a substantial risk of harm to Mr. Smith." (Doc. # 89-1 at 13) (internal quotation marks omitted). At worst, he argues, he was incorrect in diagnosing Smith's condition. (Doc. # 100 at 2-3). Dr. Kalfas also maintains that he was not deliberately indifferent because he assessed Smith on multiple occasions, ordered labs and an X-ray, and prescribed medication. (Doc. # 89-1 at 13-14). According to Dr. Kalfas, Plaintiff's claim amounts to no more than a disagreement with Dr. Kalfas's medical judgment, which is generally not actionable under § 1983. (Doc. # 89-1 at 13-14).

Dr. Kalfas is correct in that where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham v. Cty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). There is no doubt that in this case, Smith received some medical attention from Dr. Kalfas. As the Defendant acknowledges, however, the Sixth Circuit has also held that "prison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment." *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008). "Indeed, deliberate indifference may be established in cases where it can be shown that

a defendant rendered 'grossly inadequate care' or made a 'decision to take an easier but less efficacious course of treatment.'" *Jones*, 625 F.3d at 944-45 (quoting *McCarthy*, 313 F. App'x at 814).

The distinction between deliberate indifference and a mere dispute over the adequacy of treatment "is a fine one." *Jones v. Corr. Med. Servs.*, 845 F. Supp. 2d 824, 841 (W.D. Mich. 2012). In general, courts have found medical professionals to be deliberately indifferent—as opposed to merely negligent—in situations where the medical professional's "response to an obvious risk to an inmate's health is patently unreasonable." *Cairelli v. Vakilian*, 80 F. App'x 979, 984 (6th Cir. 2003). For example, in *LeMarbe*, a doctor who observed five liters of bile in the plaintiff's abdomen during surgery decided to close the incision without addressing the bile leak. 266 F.3d at 436-37. Plaintiff's expert testified that "anyone with a medical education" would have understood the risk of harm to the plaintiff from the bile leak. *Id.* at 437. Though the surgeon had numerous follow up appointments with the plaintiff and eventually referred him to a specialist, the court found that he had "clearly acted with a conscious disregard" for the patient's health. *Id.* at 438-39.

In *Comstock*, the decedent committed suicide after being removed from suicide watch. 273 F.3d at 699. The Sixth Circuit denied summary judgment for the prison psychiatrist, who based his decision to remove the decedent from suicide watch on a "facial[ly] inadequa[te] 30-minute evaluation. *Id.* at 707. The psychiatrist's conduct fell so far below the standard of care that a jury could conclude the psychiatrist acted recklessly rather than negligently. *Id.* at 709. Similarly, in *Williams v. Simpson*, No. 5:09-cv-31-R, 2010 WL 5186722, at *5 (W.D. Ky. Dec. 15, 2010), the plaintiff exhibited

symptoms consistent with life-threatening bowel problems. The plaintiff's doctor performed a short examination and found the plaintiff to be malingering. *Id.* at *1. When told later of plaintiff's new and worsening symptoms, the doctor continued to believe that the plaintiff was faking. *Id.* at *2. Eventually, the doctor sent plaintiff to the hospital, where he received emergency surgery but died shortly thereafter. *Id.* The *Williams* court denied summary judgment for the doctor, relying in part on an expert who opined that when presented with plaintiff's history and symptoms, "the first consideration of the medical officers should have been a bowel obstruction or something similar." *Id.* at *6.

The case in *Hamilton v. Pike County*, No. 11-99-ART, 2013 WL 529936 (E.D. Ky. Feb. 11, 2013) (Thapar, J.) provides an example of facts that will and will not suffice to establish a claim of deliberate indifference. *Hamilton* involved a plaintiff who suffered acute kidney failure and developed a hematoma in his lower back while being held at the Pike County Jail. *Id.* at *1. The defendant doctor initially conducted a comprehensive examination of the plaintiff, who complained of difficulty walking and breathing. *Id.* at *10. When all tests came back as normal, the doctor "hypothesized that [plaintiff's] symptoms might be either feigned or the result of drug interactions," and discontinued some of plaintiff's medications in response. *Id.* The doctor's failure to diagnose Plaintiff's condition was not deliberate indifference, as there was no evidence that he "knew or should have known that [plaintiff] had any particular ailments." *Id.*

Nevertheless, the *Hamilton* court found that the doctor's subsequent behavior presented a triable issue of fact as to the doctor's deliberate indifference. Specifically, after learning that plaintiff's symptoms had escalated "from having trouble walking to being unable to walk at all," the defendant merely prescribed a multivitamin. *Id.* at *11.

"[T]here [was] no evidence that [defendant] ever followed up with [plaintiff] or ordered further tests." *Id.* While defendant ended up sending plaintiff to the hospital two days later, the court concluded that "it is at least plausible that [defendant] knew of a serious medical risk—[plaintiff's] inability to walk—and disregarded that risk by prescribing only a multivitamin in response." *Id.*

In contrast to *LeMarbe*, *Williams*, and *Hamilton*, the court in *Kosloski v. Dunlap*, 347 F. App'x 177, 179 (6th Cir. 2009) concluded that a nurse was not deliberately indifferent to an inmate who, after experiencing certain symptoms, identified a disease to a nurse that he was at risk for. Upon determining that the inmate exhibited no symptoms consistent with the disease he claimed to have, the nurse sent him back to his cell after a two-minute exam. *Id.* As it turned out, the plaintiff was suffering from the disease he identified, and died as a result of the delayed treatment. *Id.* at 177, 179. The court held that while the nurse may have been negligent, she could not be found deliberately indifferent because she "did not appreciate that a substantial risk of serious harm existed." *Id.* at 180. In a similar case, Sixth Circuit observed that a prison doctor's prescription of a laxative in response to complaints of substantial weight loss and severe stomach pain "seem[ed] inappropriate," but was not deliberately indifferent given that some of the patient's colorectal cancer symptoms were consistent with a diagnosis of constipation. *Jones*, 625 F.3d at 945; *see also Cairelli*, 80 F. App'x at 984.

Finally, in *Williams v. Mehra*, a prison psychiatrist knew the risk that his suicidal patient would hoard his medication in order to overdose and attempted to mitigate that risk by administering the patient's medication in a "pill line." 186 F.3d 685, 688 (6th Cir. 1999) (en banc). In spite of this precaution, the prisoner ended up hoarding the pills and

overdosing. *Id.* at 689. Although administering the patient's medication in liquid form would likely have been safer, summary judgment was appropriate because "[t]here [was] nothing to suggest that the doctors were failing to treat [plaintiff] or doing less than their training indicated was necessary." *Id.* at 692.

The panels in *LeMarbe* and *Comstock* expressly distinguished their cases from *Mehra*. Whereas the *Mehra* defendants "chose one medically reasonable form of treatment over another," the *Comstock* defendant's cursory evaluation could be described as "grossly inadequate" and thus an unreasonable response to a substantial risk of harm. *Comstock*, 273 F.3d at 710. Similarly, there was evidence suggesting that the surgeon in *LeMarbe* actually knew of the danger posed by failing to plug the patient's bile leak, whereas there was no evidence in *Mehra* that the defendants inferred an excessive risk of harm from the use of a pill line. *LeMarbe*, 266 F.3d at 439-40. In that sense, the surgeon's decision to close his patient's incision without addressing the bile leak "raised more than just a simple question of whether Dr. Wisneski made the right medical judgment in treating him." *Id.* at 439.

In summary, "[w]here the defendant made a reasoned choice between two alternative treatments, considering the risk to the patient in doing so, the courts typically refuse to second-guess the doctor's judgment, even when the decision was in fact wrong." *Jones v. Corr. Med. Servs.*, 845 F. Supp. 2d at 842. In addition, a decision to render little or no treatment at all can still be considered reasonable, but only when it can be shown that the defendant failed to infer an excessive risk of harm. *See Kosloski*, 347 F. App'x at 180; *Hamilton*, 2013 WL 529936, at *10-11. Conversely, where there is an obvious risk of serious harm and little or no action is taken, a finding of deliberate indifference is

appropriate.  *See LeMarbe*, 266 F.3d at 436-37.

Taking the facts in the light most favorable to the non-moving party, this case follows *LeMarbe*, *Comstock*, *Williams*, and *Hamilton* more closely than *Kosloski*, *Jones*, and *Mehra*.  A review of the record reveals a number of facts Dr. Kalfas was aware of from which he could infer a substantial risk of serious harm to Smith.  Dr. Kalfas was aware that Smith was an intravenous (IV) heroin user immediately prior to his detention at the CCDC in February 2015.  (Doc. # 49-7 at 102).  As someone who specializes in "addiction medicine," Dr. Kalfas was familiar with the fact that IV heroin use can be a "harbinger of other medical issues," including infectious processes.  *Id.* at 7, 102.  In fact, Dr. Kalfas stated in his deposition that he understood infection in IV heroin users to be "fairly common."  *Id.* at 102.  Dr. Kalfas also admitted to having experience with osteomyelitis (bone infection) and claimed to have treated patients with this condition in the past.  *Id.* at 104.  Therefore, Dr. Kalfas was well-aware of the general risk of bone infection for a patient fitting Smith's profile.

In addition, Dr. Kalfas was aware of the following: (1) Smith complained of severe pain, numbness and tingling in his legs, and difficulty walking as early as February 22nd; (2) Smith threatened suicide if not sent to the hospital on February 25th; (3) Smith reported experiencing "sporadic paralysis"; (4) Smith again complained of severe back pain as well as bilateral leg numbness on March 2nd and was observed moaning, yelling, and screaming; (5) Smith complained of increased back pain and "appeared to be in some pain" on March 3rd; (6) Smith complained of not being able to walk on March 3rd but did walk with some difficulty when commanded to; and (7) some of Smith's symptoms, including numbness, tingling, and inability to move his legs, could be indicative of a

serious medical condition.  *See* (Docs. # 49-7 at 27, 51-52, 69, 138, 147 and 98-45 at 5).

Considering all these facts in the light most favorable to Plaintiff, a reasonable jury could

conclude that Dr. Kalfas subjectively perceived facts from which he could infer a

substantial risk of serious harm to Smith.

Whether Dr. Kalfas actually drew this inference and disregarded a serious risk of

harm are closer questions.  Nevertheless, the Court finds considerable record evidence—

both direct and circumstantial—suggesting that Dr. Kalfas "did not respond reasonably to

the substantial risk of harm [] of which he was subjectively aware."  *Comstock*, 273 F.3d

at 710.

First, there is direct evidence that Dr. Kalfas inferred the risk of bone infection as

it specifically related to Smith.  When asked "[d]id you consider Mr. Smith may have had

an infection causing his pain," Dr. Kalfas answered, "I did consider that."  (Doc. # 49-7 at

142).  When asked "[w]ere you ever concerned that Mr. Smith may have issues with

paralysis," Dr. Kalfas responded, "I was concerned, that's why I evaluated [Smith] on

[February] 26th and on [March] 3rd."  *Id.* at 181.  Dr. Kalfas testified that he used Smith's

lithium lab test results from February 17th to rule out the presence of an infection when

he last examined Smith on March 3rd.  *Id.* at 74.  He then states, however, that bone

infections can be present "for a while but . . . may not be detectable until very late."  *Id.* at

87.  Thus, Dr. Kalfas's testimony suggests that he would have known that a thirteen-day-

old lab test would be ineffective at diagnosing a bone infection.

Meanwhile, in the intervening two weeks between Smith's lab test on February

17th and Dr. Kalfas's evaluation on March 3rd, Smith told Dr. Kalfas that he was

experiencing sporadic paralysis, numbness and tingling in his legs, and had difficulty

walking, which Dr. Kalfas acknowledged could be symptoms of a serious medical condition, including osteomyelitis. (Docs. # 49-7 at 149 and 98-45 at 5). Dr. Kalfas also admitted that an MRI would have detected Plaintiff's spinal abscess and osteomyelitis. (Doc. # 49-7 at 83). Rather than ordering an MRI, however, Dr. Kalfas diagnosed Plaintiff as malingering and ordered no new treatment or diagnostic tests in response to Smith's neurological symptoms.[4] (Doc. # 49-7 at 69-70, 100).

Therefore, based on Dr. Kalfas's testimony, a reasonable jury could conclude that Dr. Kalfas "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8). Specifically, a jury could find Dr. Kalfas inferred a risk of infection in Smith's spine on February 26th and March 3rd, and chose to disregard that risk by not ordering an MRI, which would have required transporting Smith to the hospital. (Doc. # 49-7 at 83-84). A jury would also be entitled to discount Dr. Kalfas's post hoc explanation for not conducting an MRI, given his admission that infections "may not be detectable until very late" and the fact that he first learned of Smith's neurological symptoms well after Smith's February 17th lab test. *See Estate of Carter*, 408 F.3d at 313 (noting that a jury could conclude that a prison official's testimony was untruthful when it was contradicted by other evidence in the record).

Second, there exists substantial circumstantial evidence that the risk to Plaintiff was so obvious that "a reasonable doctor in [Kalfas's] position could have concluded that

---

[4]     Although Dr. Kalfas approved an X-ray for Smith on March 2nd, Nurse Slayback testified that she is the one who requested it after she saw Smith for a sick call on March 2nd. *See* (Doc. # 49-5 at 48-49, 66, 115). In fact, Dr. Kalfas declined to order an X-ray when Plaintiff requested one during his February 26th examination. In any event, Dr. Kalfas admits that an X-ray would not have been effective at detecting Smith's spinal abscess, unless it had grown to a very large size. (Doc. # 49-7 at 142).

a substantial risk of serious harm to [Smith] existed." *Phillips*, 534 F.3d at 544. Expert testimony that speaks to the obviousness of a risk can be used to demonstrate a dispute of material fact regarding whether a prison doctor exhibited conscious disregard for the plaintiff's health. *Lemarbe*, 266 F.3d at 438. Several of Smith's experts have testified that Smith's symptoms presented clear warning signs of spinal infection. Dr. Anthony Albano opines that Smith's history of IV heroin use, severe back pain, and new neurological symptoms "falls into the category of emergent MRI." (Doc. # 89-36 at 10). Another of Plaintiff's experts, Dr. Artur Hughes, states that "[t]he combination . . . of mid back pain and numbness and tingling of the legs represents a situation of medical urgency requiring appropriate imaging studies of the thoracic spine." (Doc. # 89-36 at 24). According to Dr. Hughes, "[a]ppropriate and timely imaging would have averted the spinal cord compression sustained by Mr. Smith and which left him paraplegic." (Doc. # 89-36 at 24). Therefore, a reasonable factfinder in this case "may conclude that [Dr. Kalfas] knew of a substantial risk from the very fact that the risk was obvious" and then "disregarded such risk." *Lemarbe*, 266 F.3d at 437-38 (quoting *Farmer*, 511 U.S. at 842).

Contrary to Defendant's assertions, Dr. Kalfas's care for Smith amounts to more than simply a misdiagnosis. Dr. Kalfas did diagnose Smith with degenerative disc disease on February 17th and prescribed medication. Yet, unlike in *Jones*, there is direct and circumstantial evidence that Dr. Kalfas inferred a risk of injury from a more serious condition which he did not adequately investigate or treat. Much like in *Hamilton*, there is no evidence that Smith's progressively worsening symptoms, including sporadic paralysis and immobility, could be explained by Dr. Kalfas's February 17th diagnosis of degenerative disc disease. As such, a reasonable jury could conclude that Dr. Kalfas's

failure to order an MRI in response to Smith's symptoms of paraplegia was not merely a product of poor medical judgment.

Finally, Dr. Kalfas cannot prevail on summary judgment by arguing that he subjectively believed Smith to be malingering and therefore did not consciously disregard a serious risk of harm. As *Hamilton* and *Williams* demonstrate, when a doctor is faced with reports of a patient's worsening condition, his decision not to provide treatment based on a continued belief that the patient is malingering presents a triable issue of fact regarding deliberate indifference. *Hamilton*, 2013 WL 529936, at *11; *Williams*, 2010 WL 5186722, at *6. While a subjective belief that a prisoner is faking his symptoms can negate a finding of deliberate indifference on the part of a prison official, *see Weaver v. Shadoan*, 340 F.3d 398, 412 (6th Cir. 2003), the contested question of whether a prison official actually held this subjective belief is an issue for the jury. *See Brookes v. Shank*, 660 F. App'x 465, 469 (6th Cir. 2016) (holding that "there is at the very least a question of fact" as to whether a doctor who withheld treatment from an inmate "was actually motivated by a sincere concern that [the inmate] was a drug seeker"); *Taylor v. Franklin Cty.*, 104 F. App'x 531, 540 (6th Cir. 2004); *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("The possibility that [defendants] did not do more for [plaintiff] because they thought he was malingering and did not really have a severe medical need is an issue for the jury."); *Hollenbaugh v. Maurer*, 397 F. Supp. 2d 894, 904 (N.D. Ohio 2005).

This principle is discussed at length in *Taylor*. In that case, the plaintiff was incarcerated at a county jail on a 21-day sentence and immediately began complaining of severe back pain and difficulty walking. *Taylor*, 104 F. App'x at 534. After falling in a stairwell, plaintiff continually told jail staff that he could no longer walk. *Id.* at 534-35.

Inmates housed with the plaintiff soon began complaining of plaintiff's hygiene and that he suffered from bladder incontinence. *Id.* at 534. In addition, plaintiff's wife called the jail to say that her husband had informed her that he could not walk and had bouts of incontinence. *Id.* at 535. Soon after, jail officials found plaintiff lying in his bed, unable to walk, and smelling of urine. The defendants—including a nurse—claimed, however, that three days after plaintiff's fall in the stairwell, they saw plaintiff walk on his own power and move his legs, and that he did so again two days later. *Id.* On the day of his release, jail officers told plaintiff's brother that even though plaintiff claimed he could not walk, the jail staff "knew he could." *Id.* Upon admission to the hospital, plaintiff was diagnosed with a large malignant tumor wrapped around his thoracic spine, resulting in paralysis from the waist down.

The *Taylor* court rejected the prison-guard defendant's argument that he could not be deliberately indifferent because he did not believe Plaintiff's complaints of immobility after he witnessed Plaintiff moving his legs on two occasions. *Id.* at 539. The court held that "a genuine issue arises as to how skeptical Defendant Mazzacone was regarding his subjective knowledge of Plaintiff's alleged ailment." *Id.* at 540. And furthermore, "Mazzacone may not escape liability because of his refusal to believe the seriousness of Plaintiff's ailments." *Id.* Likewise, the court found summary judgment inappropriate for the defendant nurse, who argued that her refusal to examine the plaintiff after he told her he couldn't walk was based on a subjective belief that he was faking his injuries. *Id.* at 541.

Just as in *Taylor*, the record in this case is decidedly mixed on the issue of whether Plaintiff appeared to be faking his injuries. On the one hand, there is evidence that Dr.

Kalfas and others at the CCDC understood Smith's condition to be inconsistent with his complaints. *See, e.g.*, (Docs. # 49-5 at 32-33, 98-29, and 98-41). On the other hand, others who worked at the CCDC, including Nurses Schlake and Doremus as well as Deputy Holzschuh, testified that they did not believe Smith to be feigning his pain or symptoms. *See* (Docs. # 49-2 at 59, 49-4 at 77, and 98-32 at 7). In addition, jail staff documented objective evidence of Plaintiff's injuries, including that Smith was keeping other inmates up at night with his cries of pain. (Doc. # 98-32 at 7).

Moreover, Smith's expert, Dr. Angelo Scotti, opines that "[t]here is no objective method of proving or disproving pain or symptoms such as numbness" and that in his view, "there were no findings supporting a diagnosis of malingering." (Doc. # 89-36 at 5-6). Dr. Albano, another of Smith's experts, and who has experience treating inmates, asserts that in his opinion, Plaintiff's large number of sick calls were "excessive even for a drug seeker or malingerer." (Doc. # 89-36 at 10). Furthermore, he states that Dr. Kalfas's examination "was not consistent with a patient who is becoming paraplegic." *Id.* Therefore, "material facts exist as to whether [Dr. Kalfas's] professed ignorance towards Plaintiff's vocalized medical needs is proven and whether [his] conduct caused grossly inadequate medical care in violation of the [Fourteenth Amendment]." *Taylor*, 104 F. App'x at 541. Accordingly, Plaintiff's § 1983 claim against Dr. Kalfas survives summary judgment and Dr. Kalfas's Motion for Summary Judgment on this claim is **denied**.

### b.    Nurse Clarkson

Nurse Clarkson formally examined Smith twice during his detention at the CCDC. The first examination took place on February 7th, in response to Smith's Sick Call Slip, which read, "Chronic Pain Due to Back." (Doc. # 98-5). Smith described his pain as

"aches" and reported a pain level of 8 out of 10 on the pain scale. (Doc. # 89-11). Nurse Clarkson recorded that Smith's vital signs were "slightly elevated" and recommended a three-day course of ibuprofen, which Dr. Kalfas prescribed. (Docs. # 89-6 and 98-6). Nurse Clarkson's second examination of Smith occurred on February 14 and was in response to Smith's fourth Sick Call Slip, which read "Need to See Doctor ASAP Back." (Doc. # 98-13). Nurse Clarkson noted that Smith described his back pain as "sharp, aches," which was a 10 out of 10 on the pain scale. She also noted "prior back injury" and that his vital signs were normal. (Doc. # 89-18). She wrote that Smith was already taking Tylenol and did not recommend any additional treatment.

Based on the evidence in the record, no reasonable jury could find that Nurse Clarkson was deliberately indifferent to Smith's serious medical needs. First, unlike Dr. Kalfas, there is no evidence that Nurse Clarkson was educated on the heightened risk of infection for IV heroin users or had any experience treating spinal infections. *See* (Doc. # 49-3). Second, it is undisputed that "Plaintiff's most severe symptoms occurred *after* his contacts with [Nurse Clarkson]." *Reilly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012) (emphasis in original). At the time Nurse Clarkson examined Smith, he had not yet complained of numbness or tingling in his legs or difficulty walking. Based on Smith's reported health history and symptoms, it was reasonable for Nurse Clarkson to believe he was suffering from chronic back pain from a prior accident or that he had pulled a muscle when he sneezed two weeks earlier.

Third, in response to Smith's report of intense pain on February 7th, Nurse Clarkson recommended a course of anti-inflammatory treatment. Although she did not recommend treatment for Smith's pain on February 14th, she noted that he was already

taking Tylenol for pain relief. Her determination that Smith's existing dose of pain medication was sufficient appears wrong in hindsight. But when, as here, a prisoner "received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham*, 358 F.3d at 385 (internal quotation marks omitted). Although Nurse Clarkson had the authority to send Smith to the hospital when she examined him on February 14th, *see* (Doc. # 49-3 at 65), Plaintiff's own expert opines that hospitalization was not warranted until the first indication of leg symptoms, which occurred on February 15th. (Doc. # 89-36 at 24). Consequently, Nurse Clarkson's actions cannot be characterized as "patently unreasonable," *Cairelli*, 80 F. App'x at 984, and thus her Motion for Summary judgment on Smith's § 1983 claim is **granted**.

### c. Nurse Doremus

Nurse Doremus had approximately four interactions with Smith over the course of sixteen days. On February 10, Nurse Doremus attempted to conduct a "History and Physical Assessment" for Smith, but he declined, stating "Don't need one." (Doc. # 89-14). Nurse Doremus next saw Smith on February 16th in response to Smith's Sick Call Slip, on which he wrote "Back Pain Numbness and Tingling Extra Strength Tylenol and See The Doctor!!" (Doc. # 98-15). Nurse Doremus recommended prescribing Naproxen 500 mg for his pain, which Dr. Kalfas approved shortly thereafter. Smith was also visited by Dr. Kalfas the following day.

Nurse Doremus saw Smith for the third time on February 22nd in response to Smith's complaints of pain in his lower back, along with tingling and numbness in his lower

extremities.  He also indicated that the pain interfered with walking.  Nurse Doremus completed an examination, during which she noted Smith had facial grimacing.  She reported Mr. Smith's symptoms to Dr. Kalfas, who prescribed a higher dose of Baclofen.  Nurse Doremus last examined Smith on February 26th in response to Smith's Sick Call Slip, which stated "Back Pain, Possible Bulging Discs Need to See Doctor Need X Rays Immediately."  (Doc. # 98-24).  Nurse Doremus took Smith's vitals and referred him to Dr. Kalfas, who examined him later that day.

When viewed in the light most favorable to Smith, facts in the record show that Nurse Doremus was aware of and inferred a substantial risk of serious harm to Smith.  Nurse Doremus became aware of Smith's neurological symptoms as soon as February 16th, when she presumably saw on his Sick Call Slip complaining of numbness.  She also recorded Smith's complaints of lower extremity numbness during her two subsequent examinations on February 22nd and 26th.  Additionally, Nurse Doremus testified that tingling and numbness is "concerning" and could be a sign of a serious medical issue depending on the circumstances.  (Doc. # 49-4 at 44).  Lastly, Nurse Doremus testified to knowing that Smith was in pain during his February 22nd exam because he exhibited facial grimacing.  (Doc. # 49-4 at 47).

Even assuming, however, that Smith's reported symptoms and Nurse Doremus's understanding of the seriousness of those symptoms constituted sufficient evidence to conclude that she knew of Plaintiff's serious medical needs, there is insufficient evidence that Nurse Doremus "disregarded the substantial risk of serious harm" to Smith.  *Estate of Carter*, 408 F.3d at 313.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to

the risk, even if the harm ultimately was not averted." *Grabow v. Cty. of Macomb*, 580 F. App'x 300, 308 (6th Cir. 2014) (quoting *Farmer*, 511 U.S. at 844).

In considering whether Nurse Doremus acted reasonably in response to an excessive risk of harm, the Court is cognizant of the fact that nurses, unlike doctors, are "not licensed to independently diagnose conditions, devise treatment plans, or prescribe medicine." *Hamilton*, 2013 WL 529936, at *12. In situations where a medical emergency is obvious even to a layperson, a nurse acts reasonably when she *immediately* notifies a doctor of a patient's serious medical need or sends the patient to a hospital for emergency care. *See Warren v. Prison Health Servs.*, 576 F. App'x 545, 557, 558 (6th Cir. 2014); *cf. Terrance*, 286 F.3d at 846 (holding that prison nurse could be held liable for failing to "immediately seek alternate medical assistance").

Relatedly, in cases where a prisoner's medical condition appears serious, but less urgent, a nurse's timely examination and subsequent referral to a doctor is generally sufficient to avoid § 1983 liability. For instance, in *Winkler v. Madison County*, a nurse examined a prisoner complaining of severe stomach pain, chills, achiness, and elevated blood pressure. 893 F.3d 877, 886 (6th Cir. 2018). The nurse suspected that the prisoner was suffering from opiate withdrawal, when in fact he had a perforated duodenal ulcer and died three days later. *Id.* at 886, 889. In affirming the district court's grant of summary judgment for the nurse, the Sixth Circuit noted that the nurse was arguably negligent in failing to further investigate the prisoner's condition. *Id.* at 894. Yet, the nurse did not disregard a serious risk of harm because the evidence showed that she "gathered information about [plaintiff's] condition, provided it to a medical professional qualified to evaluate him, and followed the directions of that medical professional." *Id.*

The court in *Hamilton* reached a similar conclusion, finding that a jail nurse who was subjectively aware of the plaintiff's inability to walk did not disregard an excessive risk of harm when she quickly notified the doctor on staff. 2013 WL 529936, at *12. Conversely, the Sixth Circuit in *Bays v. Montmorency County* held that summary judgment was inappropriate for a jail nurse who scheduled an appointment with a specialist "weeks in the future" despite observing symptoms that required "immediate or near-immediate care." 874 F.3d 264, 270 (6th Cir. 2017).

In addition, because nurses are unable to diagnose and treat conditions on their own, nurses may be "shielded" from liability by a doctor's reasonable diagnosis. *Hamilton*, 2013 WL 529936, at *12. However, a nurse's deference to a physician's instructions "may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Id.* at *12 (quoting in a parenthetical *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012)); *see also Williams*, 2010 WL 5186722, at *7.

Here, Smith's need for additional care was not so obvious that Nurse Doremus's deference to Dr. Kalfas's course of treatment was deliberate indifference. *See Hamilton*, 2013 WL 529936, at *12. When Nurse Doremus examined Smith on February 22nd and 26th, he complained of numbness and tingling in his extremities, as well as pain that interfered with walking. Yet, Smith's condition had not yet progressed to the point of complete paralysis or inability to walk. Unlike Dr. Kalfas, Nurse Doremus was not familiar with the heightened risk of infection from IV heroin use. Nor is there evidence that she had experience treating osteomyelitis. Therefore, while Dr. Kalfas may have disregarded an obvious risk of spinal infection, Nurse Doremus acted reasonably in deferring to Dr.

Kalfas's diagnosis of degenerative disc disease on February 17th.

Furthermore, it is undisputed that Nurse Doremus responded in a timely manner to each of Smith's Sick Call Slips and promptly reported Smith's symptoms to Doctor Kalfas. As a result, within hours after each of his visits with Nurse Doremus, Smith was either prescribed treatment or seen by Dr. Kalfas. Although hindsight shows the more prudent approach would have been for Nurse Doremus to send Smith to the hospital after either of her exams on February 22nd and 26th, her decision to instead quickly refer Plaintiff to Dr. Kalfas represents a reasonable exercise of medical judgment. It cannot be said that Nurse Doremus's treatment of Smith was "so cursory as to amount to no treatment at all." *Winkler*, 893 F.3d at 892 (quoting *Terrance*, 286 F.3d at 843). Accordingly, Nurse Doremus's Motion for Summary Judgment on Smith's § 1983 claim is **granted**.

### d. Nurse Slayback

Nurse Slayback was the last of the nurses to have contact with Smith. The record indicates that she became familiar with Smith's condition at around 8:23 a.m. on March 2nd, when Officer Tyler Holzschuh reported to her that he heard Smith making "audible 'grunting' sounds as if he was in pain." (Doc. # 98-31). Officer Holzschuh also told Nurse Slayback that he observed Smith laying in his bunk, out of breath, and complaining that he could not feel his legs all the way up to his waist. *Id.* Nurse Slayback responded that Smith was "faking" and ordered that he be placed into medical isolation for observation. *Id.* Nurse Slayback examined Smith later that morning at 11:20 a.m. and noted that Smith complained of back pain and numbness in both legs. She ordered that he be held in isolation for "abuse of medical services." Nurse Slayback examined Smith again shortly

thereafter at 1:56 p.m., observing that Smith was able to bear weight and move all of his extremities, but continued to moan, yell, and scream. As a result of this examination, Nurse Slayback recommended to Dr. Kalfas that Smith receive an X-ray. Also on March 2nd, Nurse Slayback denied Smith's grievance requesting emergency medical care.

On March 4th at 1:57 p.m., Nurse Slayback spoke with Smith's sister, who requested that Smith be transported to the emergency room because he told her he could no longer move his legs. Nurse Slayback recommended not sending Smith to the hospital on March 4th but did order that he be put on suicide watch after observing scratches on his wrist. On March 5th, Nurse Slayback ordered Smith be sent to the hospital after observing him sleeping face-down on the floor of his cell.

There is substantial record evidence showing that Nurse Slayback actually knew that Smith was suffering from a serious medical problem. Slayback was told repeatedly of Smith's inability to walk, including by Officer Holzschuh, who notified her that Smith was immobilized and could not feel his legs. Nurse Slayback admitted that she had heard from Smith, Smith sister, and various jail guards that Smith desperately wanted to go to the hospital. (Docs. # 49-5 at 75-76, 98-31, and 98-37). Nurse Slayback also personally witnessed Smith's complaints of numbness and inability to walk during her examination on March 2nd. Such obvious signs of immobility and lower extremity numbness were "clear symptoms of a serious problem, even if [Slayback] did not choose to believe Plaintiff." *Taylor*, 104 F. App'x at 538.

Moreover, notwithstanding her professed disbelief in the authenticity of Smith's reported symptoms, Nurse Slayback's "actions, notes, and words suggest that she recognized [Smith's] distress." *Bays*, 874 F.3d at 268. Nurse Slayback testified that she

knew of Smith's heightened risk for infection as a result of his heroin use.   (Doc. # 49-5 at 74).   After examining Smith, Nurse Slayback asked Dr. Kalfas to order an X-ray and placed Smith in medical isolation for observation.   She also wrote in Smith's Progress Report on March 5th that she was sending him to the hospital for "psychosomatic complaints of lower extremity paralysis."   (Doc. # 98-37).   "These facts taken together would permit a jury to conclude that [Slayback] subjectively thought there was a 'risk of serious harm.'"   *Bays*, 874 F.3d at 268 (quoting *Farmer*, 511 U.S. at 837).

A reasonable jury could also decide that Nurse Slayback disregarded this serious risk of harm.  As discussed above, when a nurse becomes aware of a prisoner's emergent condition, she must immediately seek medical assistance.  *Warren*, 576 F. App'x at 558; *Terrance*, 286 F.3d at 846.  The evidence shows that by the time Nurse Slayback became involved in Smith's care, his condition had progressed from urgent to emergent, as he was at times entirely immobile and reporting complete numbness in his legs.  Yet, when Officer Holzschuh notified Nurse Slayback of Smith's condition on March 2nd, she did not immediately call Dr. Kalfas or send Plaintiff to the hospital.   Instead, she told Officer Holzschuh that Smith was "faking" and that she would see him at his scheduled visit later in the day.  Later when Nurse Slayback heard from Smith's sister that Smith was unable to walk and needed to be transferred to the hospital, Nurse Slayback refused. Revealingly, when asked in her deposition what had changed on March 5th that led her to send Plaintiff to the hospital, Nurse Slayback responded, "there was no change."  (Doc. # 49-5 at 80).  Rather, she described her decision to send Smith to the hospital on March 5th as "dotting our i's and crossing our t's."  (Doc. # 49-5 at 80).  Consequently, a jury could reasonably conclude that Nurse Slayback inferred a risk of harm on March 2nd but

failed to act on that inference until March 5th. Thus, a genuine issue exists as to whether Nurse Slayback "consciously acted unreasonably in response to [a] known risk." *Sours*, 593 F. App'x at 485.

Finally, unlike Norse Doremus, Nurse Slayback is not shielded by Dr. Kalfas's diagnoses of malingering on February 26th and March 2nd. As discussed, a nurse's deference to a doctor's care must be reasonable under the circumstances. "A nurse may therefore act with deliberate indifference if he or she 'ignore[s] obvious risks to an inmate's health' in following a physician's orders." *Holloway*, 700 F.3d at 1075 (quoting *Rice v. Corr. Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012)). There are facts in the record showing that Nurse Slayback continued to rely on Dr. Kalfas's malingering diagnosis even after she became aware of Smith's emergent condition. Accordingly, "the 'extent to which [Nurse Slayback] relied on [Dr. Kalfas's] medical judgment and the reasonableness of any such reliance require further exploration at trial.'" *Williams*, 2010 WL 5186722, at *8 (quoting *Berry v. Peterman* 604 F.3d 435, 444 (7th Cir. 2010)). Thus, Nurse Slayback's Motion for Summary Judgment on Smith's § 1983 claim is **denied**.

### e. Jailer Daley

Plaintiff also brings a deliberate-indifference claim against Campbell County Jailer James Daley in both his individual and official capacities. It is well-established that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see also Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). Therefore, Plaintiff's claim against Daley in his official capacity will be treated as a claim against Campbell County, which is discussed in Part II.D.2.g, *infra*. The Court thus turns its

attention to Plaintiff's individual-capacity claim against Daley.

As a county official, Daley is entitled to qualified immunity for suits against him in his individual capacity. *Phillips*, 534 F.3d at 538. The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Phillips*, 534 F.3d at 538 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, to survive Daley's motion for summary judgment, Plaintiff must demonstrate two things: (1) that Daley violated Plaintiff's constitutional right and (2) that the constitutional right was "clearly established at the time of the violation." *Phillips*, 534 F.3d at 538-39. "If no constitutional violation occurred, the inquiry is over and summary judgment must be granted to the officer." *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008). Thus, the Court begins by asking whether there is a genuine issue of material fact that Daley violated Smith's constitutional rights.

Daley correctly observes that he had "no personal interaction" with Smith while he was detained at the CCDC. (Doc. # 101 at 3). This does not mean, as Daley contends, that he "cannot be found to be deliberately indifferent to [Smith's] serious medical needs." (Doc. # 101 at 3). Rather, Plaintiff's claim against Daley in his individual capacity is understood to rely on a theory of supervisory liability. *See* (Doc. # 1 at 5); *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (holding that a prison medical director could be liable as a supervisor for deliberate indifference despite no "direct personal involvement" with the aggrieved inmate). Smith advances two main arguments to support his claim that Daley exhibited deliberate indifference. First, he suggests that Daley inadequately

supervised jail staff members and SHP employees. Specifically, he asserts that "there is sufficient evidence that Daley disregarded his responsibilities as Jailer and left Smith at the mercy of otherwise unsupervised medical providers." (Doc. # 99 at 16).

Second, Smith claims that Daley was deliberately indifferent to his serious medical needs because he created and/or approved of medical treatment policies that Smith says are unconstitutional. According to Smith, these policies encouraged delayed treatment for detainees and imposed "punishment"—including isolation and withholding of privileges—on detainees who requested medical treatment. (Doc. # 99 at 15-16). Smith also argues that Daley is responsible for a policy of almost complete delegation of medical treatment to SHP, which he claims led to constitutionally-inadequate health outcomes in the CCDC. The Court will address Plaintiff's "inadequate supervision" and "unconstitutional policy" arguments in turn. As shown below, both fail as a matter of law.

### i. Failure to Supervise

The Sixth Circuit has long recognized a cause of action under § 1983 against supervisors who fail to adequately train or supervise their subordinates. *See Hays v. Jefferson Cty.*, 668 F.2d 869, 872-74 (6th Cir. 1982); *Phillips*, 534 F.3d at 544. However, "[i]t is well-settled that 'government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior.*" *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Nor is it enough to show that the supervisor was "sloppy, reckless or negligent in the performance of [his] duties." *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). Rather, to succeed under a supervisory-liability theory, a plaintiff must demonstrate that "the supervisor 'either encouraged the specific incident of misconduct

or in some other way directly participated in it.'" *Phillips*, 532 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee* 199 F.3d at 300. "As part of this inquiry, [the] court also considers whether there is a causal connection between the defendant's wrongful conduct and the violation alleged." *Peatross*, 818 F.3d at 242.

Thus, to be liable in a supervisory capacity under § 1983, courts have held that the supervisor must have some contemporaneous knowledge of his subordinates' unconstitutional conduct that resulted in a direct injury to the plaintiff. For instance, in *Turner v. City of Taylor*, 412 F.3d 629, 643 (6th Cir. 2005), the Sixth Circuit ruled that prison supervisors could not be held liable for a subordinate's use of excessive force against an inmate because there was no evidence that the supervisors "either participated in the beatings or knew about them at any time." Similarly, this Court in *Smith v. Buckler* declined to impose supervisory liability on Jailer Daley for injuries suffered by a mentally disabled detainee who alleged that he was sexually assaulted by his cellmate. Daley's subordinates had placed the plaintiff in an isolation cell with his alleged assailant, who was serving time for sexually assaulting a mentally disabled man. *Smith*, No. 14-51-DLB-CJS, 2016 WL 4132198, at *2 (E.D. Ky. Aug. 2, 2016). Yet, the plaintiff in *Smith* had not produced any evidence showing that Daley himself was aware of plaintiff's presence in the CCDC until after the alleged incident took place or that he knew his subordinates had planned to house the plaintiff in the same cell as his alleged assailant. *Id.* at *6.

In contrast, the court in *Taylor v. Michigan Department of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) ruled that summary judgment was inappropriate for a warden sued in

his supervisory capacity under § 1983. In that case, the plaintiff had alleged that the warden displayed deliberate indifference in failing to protect him from sexual assault. The court found that there was a triable issue of fact as to "whether Warden Foltz knew that conditions [at the prison camp] posed a substantial risk of serious harm to prisoners like plaintiff" and "whether in the face of this knowledge he acted with deliberate indifference . . . by failing to adopt reasonable policies to protect inmates like [plaintiff]." *Id.* at 77. Stated differently, the warden had "abandon[ed] the specific duties of his position . . . in the face of *actual knowledge* of a breakdown in the proper workings of the department." *Id.* at 81 (emphasis added). In an analogous case, the defendant supervisor referred inmates' medical complaints that he received personally to a nurse "whom he knew to be wrongly altering and destroying some of the inmates' prescriptions." *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992). As such, the supervisor could properly be sued under § 1983 in his supervisory capacity. *Id.*

In the present case, Smith has failed to identify any evidence suggesting that Daley was at all aware of Smith's medical problems during his detention at the CCDC. Nor has he shown that Daley had knowledge of a "breakdown in the proper workings of the [jail]" that then led to Plaintiff's injuries. *Hill*, 962 F.2d at 1213; *see, e.g.*, (Doc. # 91-45 at 3) ("Q: Were you ever made aware that Mr. Smith was complaining of back pain and having problems breathing? Mr. Daley: No, sir."). Without this evidence, a jury could not find that Daley took a "specific action" indicating that he "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Phillips*, 534 F.3d at 543, 544.

Furthermore, Plaintiff's argument that Daley "left Smith at the mercy of otherwise unsupervised medical providers" is unavailing. (Doc. # 99 at 16). It is not unconstitutional "for municipalities and their employees to rely on medical judgments made by medical professionals responsible for prisoner care." *Graham*, 358 F.3d at 384 (internal quotation marks omitted). Therefore, Daley was entitled to defer to SHP and the medical professionals it hired to treat detainees at the CCDC. Accordingly, he cannot be found deliberately indifferent under a failure-to-supervise theory.

### ii. Unconstitutional Policies

In addition to arguing that Daley failed to properly supervise his subordinates, Plaintiff asserts that Daley created and oversaw unconstitutional policies at the CCDC. Sixth Circuit law permits a § 1983 claim against supervisors "based on creation of a policy or custom" that "itself amounts to deliberate indifference on the part of the supervisory officials." *Ronayne v. Ficano*, No. 90-1135, 1999 WL 183479, at *1 (6th Cir. Mar. 15, 1999) (unpublished table decision) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Young v. Martin*, 51 F. App'x 509, 515 (6th Cir. 2002). However, "[s]upervisory personnel are not liable under § 1983 for constitutionally-proscribed misconduct by their subordinates unless the plaintiff demonstrates '*an affirmative link* between the occurrence of the misconduct and the adoption of any plan or policy—express or otherwise—showing the supervisor's authorization or approval of such misconduct.'" *Miller v. Bock*, 55 F. App'x 310, 311 (6th Cir. 2003) (internal ellipsis omitted) (emphasis added) (quoting *Rizzo v. Goode*, 423 U.S. 362, 371 (1976)). Plaintiff cannot demonstrate such an affirmative link in this case.

Smith first argues that Daley implemented a policy of "punishment" for CCDC detainees who sought medical care. Plaintiff's only support for this claim comes from the following passage in Daley's deposition, in which Daley answered questions about an incident report involving Smith as well as the CCDC's disciplinary policy.

> Q:     Okay.   Further down in this paragraph, actually the last sentence, the deputy writes, "I also advised Inmate Smith that any further remarks to Medical will result in him having his mat taken for three days." Do you know what he's talking about there? . . .
>
> A:     And again, I wasn't there so I'm going to tell you what generally would be occurring.
>
> Q:     Absolutely.
>
> A:     Apparently [Smith] was pretty much of a jackass with Medical.
>
> Q:     It sounds like he got in a fight with someone with Medical?
>
> A:     Correct.   And we don't appreciate that.   We have a hard enough time keeping medical staff, staff, period.  So what they will do, as a disciplinary measure, is take their mat so they can't just lay on it all day long, 24 hours a day, seven days a week.

(Doc. # 99-45 at 4-5).

Contrary to Plaintiff's assertion, this testimony does not establish a genuine issue of material fact as to a policy of deliberate indifference. For starters, it is certainly not unconstitutional for supervisors at detention facilities to have disciplinary procedures in place to maintain safety and security. *See McLaurin v. Morton*, 48 F.3d 944, 948-49 (6th Cir. 1995). Furthermore, Daley in his deposition testimony did not articulate a policy that punishes detainees who request medical services. Rather, Daley understood the CCDC policy to allow for discipline of a detainee who presents a legitimate safety risk, including one who "[gets] in a fight with someone in Medical," or who is being a "jackass" with medical staff. (Doc. # 99-45 at 5). Given that "prison officials must be free to take

appropriate action to ensure the safety of inmates and corrections personnel," *McLaurin*, 48 F.3d at 948, the Court cannot say that disciplining a detainee in these scenarios is constitutionally prohibited. As such, Plaintiff cannot show that this policy "itself amounts to deliberate indifference on the part of [Daley]." *Ronayne*, 1999 WL 183479, at *1.

Even assuming the prison deputy referenced in the above deposition testimony was disciplining Smith for seeking medical assistance, there is no evidence that doing so was in step with CCDC policy or that it was done with Daley's "authorization or approval." *Miller v. Bock*, 55 F. App'x at 311. Thus, to hold Daley responsible for the deputy's allegedly unconstitutional conduct in this case would amount to the application of *respondeat superior* liability, which is impermissible under § 1983. *Id.*

Second, Smith criticizes Daley's "policy of relying on [SHP] to address any [medical] problem" at the CCDC. (Doc. # 99 at 16). In his deposition, Daley states that when CCDC deputies are alerted to a health issue, they are to notify the SHP medical staff. (Doc. # 99-45 at 6). Daley admits that CCDC supervisors do not become involved in a detainee's medical care unless a detainee's health condition is "significant." *Id.* at 3. Daley further admitted that CCDC supervisors are not more involved in detainee healthcare because CCDC has "500 inmates that complain about pain every day, pain of some sort or another." *Id.* Therefore, Smith argues that Daley's hands-off policy towards detainee healthcare existed because "the medical needs of the inmates are too numerous to give them attention." (Doc. # 99 at 16). Such a policy, Smith contends, led to the "purposeful disregarding of serious medical needs and demonstrates a subjective deliberate indifference." *Id.*

Unfortunately for Plaintiff, his argument is foreclosed by the Sixth Circuit's decision in *Graham v. County of Washtenaw*, 358 F.3d 377 (6th Cir. 2004), which insulates municipalities and their policymakers from liability under § 1983 when county policy delegates the provision of prison healthcare to a private contractor. In *Graham*, a pretrial detainee at a county jail died from ingesting a large quantity of cocaine, which he had done shortly before entering the facility. *Id.* at 379. His estate brought suit under § 1983 against the county, alleging that its contract with the private healthcare provider SecureCare "impermissibly create[d] a policy of 'automatic deference' by jail personnel to the decisions of SecureCare staff concerning the medical treatment of prisoners." *Id.* at 380-81. Specifically, the plaintiff in *Graham* argued that the jail's policy of complete deference to SecureCare in "determining whether emergency services and/or hospitalization are necessary" constituted deliberate indifference to plaintiff's serious medical needs. *Id.* at 383.

The court in *Graham* affirmed a grant of summary judgment in favor of the defendant county. *Id.* at 385. In doing so, the court observed that "it is not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails. Nor is it unconstitutional for municipalities and their employees to rely on medical judgments made by medical professionals responsible for prisoner care." *Id.* at 384. In fact, the court concluded, it is especially advantageous for jails to defer to private medical providers regarding "critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted." *Id.* Therefore, even assuming "that the medical care [plaintiff] received was so woefully inadequate as to rise to the level of a

constitutional violation. . . . that violation 'resulted from factors other than a faulty [County policy].'" *Id.* (third alteration in original) (quoting *Harris*, 489 U.S. at 390-91).

This case falls squarely within the rule established by *Graham*. Similar to the plaintiff in *Graham*, Smith seeks to blame county policy for SHP's alleged failure to provide Smith with timely emergency medical care. Even if a jury could find that Smith's care at the CCDC fell below constitutional standards, there would be no "direct causal link" between CCDC's policy and the constitutional violation. *Graham*, 358 F.3d at 383.

In summary, Smith is unable to establish either that Daley was constitutionally deficient as a supervisor or that he administered an unconstitutional policy. Moreover, Plaintiff has not demonstrated a "causal connection" between his injuries and Daley's alleged inadequate supervision. *Peatross*, 818 F.3d at 242. As there is no genuine issue of material fact regarding whether Daley committed a constitutional violation, he is entitled to qualified immunity. *Davenport*, 521 F.3d at 550. Hence, Daley's Motion for Summary Judgment on Smith's § 1983 claim is **granted**.

### f.    Campbell County

Plaintiff has also brought a § 1983 claim against Campbell County. Like supervisors, a county may not be held liable under a theory of *respondeat superior*. *Monell*, 436 U.S. at 691. Instead, a plaintiff suing a municipality under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Smith states in his Response that his claim against Campbell County mirrors his claim against Daley—that is, "the policy, practice and custom of the Detention Center was to shirk all responsibility for inmate medical care beyond calling SHP." (Doc. # 99 at 16). As discussed, this theory of liability is precluded

by *Graham*.  Therefore, Campbell County's Motion for Summary Judgment on Smith's § 1983 claim is **granted**.

### g.      Southern Health Partners

As a private corporation that "perform[s] a traditional state function such as providing medical services to prison inmates," SHP may be sued under § 1983.  *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  However, "private corporations cannot be held liable on the basis of *respondeat superior* or vicarious liability."  *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014) (citing *Street*, 102 F.3d at 818).  Therefore, Plaintiff must prove that there has been a constitutional violation and "that a policy or custom" of SHP "was the 'moving force' behind the deprivation" of constitutional rights.  *Id.* (quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 254-55 (6th Cir. 2010)).  Plaintiff concedes that summary judgment should be granted for SHP on his § 1983 claim, as he cannot show that a policy or custom of SHP was the moving force behind the alleged deprivation of Smith's constitutional rights.  (Doc. # 98 at 19).  Therefore, SHP's Motion for Summary Judgment on Smith's § 1983 claim is **granted**.

### E.      State-Law Claims

#### 1.      *Campbell County*

Plaintiff correctly concedes that summary judgment is appropriate for his state-law claims against Campbell County.  (Doc. # 99 at 17).  "Kentucky counties are cloaked with sovereign immunity."  *Lexington-Fayette Urban Cty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004).  Furthermore, "Kentucky has not waived its immunity against tort suits or suits for violations of administrative regulations . . . ."  *Hamilton*, 2013 WL 529936, at *5. Therefore, the Court **grants** Campbell County's Motion for Summary Judgment on all of

Smith's state-law claims.

### 2. *Jailer Daley*

Plaintiff also concedes that summary judgment should be granted for Jailer Daley in his individual capacity on Smith's state-law claims. (Doc. # 99 at 17). Thus, summary judgment is **granted** for Jailer Daley on all of Smith's state-law claims.

### 3. *Negligence Claims*

Plaintiff brings negligence and gross negligence claims against the SHP Defendants. *See* (Doc. # 1 at 9). In their Motion for Summary Judgment, the SHP Defendants discuss the issue of negligence only as it relates to Nurses Nash and Sparks.[5] *See* (Doc. # 89-1 at 20-21). Their Motion is otherwise silent on Plaintiff's negligence claims against SHP, Dr. Kalfas, and Nurses Clarkson, Doremus, and Slayback. "A party moving for summary judgment has the burden of 'pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case.'" *Hamilton*, 2013 WL 529936, at *13 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 325). "This initial burden is a light one." *Id.* However, a "defendant should not make a motion for summary judgment, without pointing out the deficiencies of the plaintiff's case, and then expect the court to rule in the defendant's favor." *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494, 507 (6th Cir. 2006). As the SHP Defendants do not even attempt to demonstrate an absence of evidence supporting the Plaintiff's negligence claims against SHP, Kalfas, Clarkson, Doremus, and Slayback, they have not met their initial burden on summary judgment.

---

[5] Plaintiffs concede that summary judgment is appropriate for Nurses Nash and Sparks, and the Court granted summary judgment for these defendants earlier in this opinion. *See* Part II.A, *supra*.

In its Reply Brief, SHP appears to argue that Plaintiff never brought state-law claims against it directly as a corporation, and furthermore, that Plaintiff's complaint is insufficient to state a claim against SHP on a theory of vicarious liability. (Doc. # 100 at 3). Notwithstanding the fact that this argument is undeveloped, the Court need not consider it, given that it was raised for the first time in reply. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). Even assuming this issue were properly before the Court, it is without merit. Plaintiff's Complaint properly states a claim for vicarious liability against SHP. Plaintiff names SHP in the Complaint and alleges an employment relationship between SHP and the Nurse Defendants, and a contractual relationship between SHP and Dr. Kalfas.[6] (Doc. # 1 at 4). Furthermore, the Complaint alleges tortious conduct by the Nurse Defendants and Dr. Kalfas within the scope of their employment/contractual relationships with SHP. *See Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 50-51 (Ky. 2008). The fact that the Complaint does not expressly state the term "vicarious liability" or "*respondeat superior*" does not change the Court's conclusion. *See Ryder Integrated Logistics, Inc. v. Cordell Transp. Co., LLC*, No. 3:14-cv-347-JGH, 2015 U.S. Dist. LEXIS 27556, at *2 (W.D. Ky. Mar. 6, 2015).

Therefore, summary judgment on Smith's negligence claims is **granted** for nurses Nash and Sparks and **denied** for SHP, Dr. Kalfas, and Nurses Clarkson, Doremus, and Slayback.

### 3.     *501 Ky. Admin. Regs. § 3:090*

The SHP Defendants move for summary judgment on Plaintiff's claim under Title

---

[6]     In certain circumstances, Kentucky courts have permitted vicarious liability against a principal even if the agent is not a servant, but rather an independent contractor such as Dr. Kalfas. *See Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 151 (Ky. 2003).

501 of the Kentucky Administrative Regulations ("KAR"), which prescribes rules for the provision of emergency care in Kentucky jails. In support of their Motion, the SHP Defendants assert that expert testimony is required to prove a violation of 501 KAR § 3:090. (Doc. # 89-1 at 16). This proposition is both uncited and unexplained.[7] The SHP Defendants wait until their Reply Brief to flesh out their argument, namely, that a claim under 501 KAR § 3:090 is in actuality a negligence per se claim for medical malpractice, and in turn, expert testimony is required to establish liability in medical negligence cases brought under Kentucky law. (Doc. # 100 at 3-4). The SHP Defendants cite no authority for the principle that a claim under 501 KAR § 3:090 is a de facto negligence per se claim, though the Court has found cases stating as much. *See, e.g.*, *Rice v. Montgomery Cty.*, No. 5:14-181-KKC, 2016 WL 2596035, at *18 (E.D. Ky. May 5, 2016); *Webb v. Jessamine Cty. Fiscal Court*, 802 F. Supp. 2d 870, 889 (E.D. Ky. 2011). Yet, in these cases, courts allowed negligence per se claims based on 501 KAR § 3:090 to advance to trial without the benefit of expert testimony. *Rice*, 2016 WL 2596035, at *18; *Webb*, 802 F. Supp. 2d at 889. Therefore, the Court rejects the SHP Defendants' argument that expert testimony is needed for negligence claims premised on 501 KAR § 3:090. To the extent that the SHP Defendants argue in their Reply that there is an absence of non-expert evidence in support of Plaintiff's 501 KAR § 3:090 claim, that argument is waived. *Flowers*, 513 F.3d at 553. As such, except as it pertains to Nurses Nash and Sparks, the SHP Defendants' Motion for Summary Judgment on Plaintiff's 501 KAR § 3:090 claim is **denied**.

---

[7] The Court notes that Chief Judge Caldwell recently rejected this very argument because SHP failed to cite any supporting authority. *See Rice v. Montgomery Cty.*, No. 5:14-181-KKC, 2016 WL 2596035, at *18 (E.D. Ky. May 5, 2016).

### 4. Outrage

Finally, the SHP Defendants argue that they are entitled to summary judgment on Plaintiff's outrage claim.[8] In Kentucky, the tort of outrage is considered a "gap-filler" tort, "providing redress for extreme emotional distress in those instances in which the traditional common law actions did not." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993). Thus, when a plaintiff can recover emotional-distress damages by way of a traditional tort such as negligence, "the tort of outrage will not lie." *Id.* Here, Smith has brought negligence claims against the SHP Defendants, and the Court has found that those claims survive summary judgment. Thus, "negligence [is] the appropriate vehicle of recovery for Smith's alleged emotional damages, not the independent tort of outrage." *Ham*, 2012 WL 6675133, at *6. Therefore, the SHP Defendants' Motion for Summary Judgment on Plaintiff's outrage claim is **granted**.

### III. CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1) Defendants Campbell County and Jailer James Daley's Motion for Summary Judgment (Doc. # 91) is **granted**;

(2) SHP Defendants' Motion for Summary Judgment (Doc. # 89) is **granted** in part and **denied** in part. Specifically,

(a) SHP Defendants' Motion is **granted** on **Count I** (§ 1983 deliberate indifference) as it pertains to Defendants **Anna Nash**, **Marissa Sparks**, **Amanda**

---

[8] Although Plaintiff asserts intentional infliction of emotional distress as a separate claim, "intentional infliction of emotional distress and outrage are synonymous in Kentucky law." *In re Triple S Rests., Inc.*, 519 F.3d 575, 578 n.1 (6th Cir. 2008) (citing *Papa John's Int'l, Inc.*, 244 S.W.3d at 49). Therefore, the Court considers the two claims together.

**Clarkson**, **Leslie Doremus**, and **SHP**, and **denied** as it pertains to Defendants **Mina Kalfas** and **Krista Slayback**;

   (b)   SHP Defendants' Motion is **granted** on **Count II** (negligence and gross negligence) as it pertains to Defendants **Anna Nash** and **Marissa Sparks**, and **denied** as it pertains to **Mina Kalfas**, **Amanda Clarkson**, **Leslie Doremus**, **Krista Slayback**, and **SHP**;

   (c) SHP Defendants' Motion is **granted** on **Count III** (outrage) and **Count IV** (intentional infliction of emotional distress);

   (d) SHP Defendants' Motion is **granted** on **Count V** (501 KAR § 3:090) as it pertains to Defendants **Anna Nash** and **Marissa Sparks**, and **denied** as it pertains to **Mina Kalfas**, **Amanda Clarkson**, **Leslie Doremus**, **Krista Slayback**, and **SHP**.

   (3)   Plaintiff David Smith's claims against Campbell County, James Daley, Anna Nash, and Marissa Sparks are **dismissed with prejudice**.

   (4)   Within **twenty (20) days** from the date of entry of this Memorandum Opinion and Order, the remaining parties—Plaintiff David Smith and Defendants Mina Kalfas, Amanda Clarkson, Leslie Doremus, Krista Slayback, and SHP—**shall file a Joint Status Report**, setting forth available dates for a Final Pretrial Conference and Jury Trial, and whether they would be amenable to a court-facilitated settlement Conference on the remaining claims.

   This 25th day of March, 2019.



Signed By:
*David L. Bunning*
United States District Judge